## UNITED STATES v. CONTINENTAL CASUALTY CO.

### No. 944.

District Court, E. D. Louisiana.
Oct. 7, 1939.

Rene A. Viosca, U. S. Atty., and Robert Weinstein, Asst. U. S. Atty., both of New Orleans, La.

Purnell M. Milner, of New Orleans, La., for defendant.

BORAH, District Judge.

This case was tried by the Court without the intervention of a jury; accordingly in compliance with Rule 52 of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, the Court makes the following findings of fact:

The plaintiff at all times mentioned herein was and now is a corporation sovereign and body politic.

· The defendant, the Continental Casualty Company, is a corporation organized and existing under the laws of the State

of Indiana and at all times mentioned herein was authorized to do and was doing business in the State of Louisiana at New Orleans within the jurisdiction of this Court.

On November 17, 1932, the Grasser Contracting Company, a Louisiana corporation, as principal, with the Continental Casualty Company as surety thereon, entered into a contract with the United States of America represented by J. N. Hodges, Lieutenant Colonel, Corps of Engineers, United States Army, as contracting officer for furnishing all labor and materials and performing all work required for the construction of the Picayuneville-Waterloo Levee, Relief Levee Items R–805–A, R–805–B, R–805–C, R–805–D and R–805–E, all situated in the Atchafalaya Front Levee District; Dicharry Levee, Relief Levee Item L–891; and Upper Darrow Levee, Relief Levee Item L–894, both situated in the Pontchartrain Levee District.

Pursuant to the provisions of the Heard Act, Title 40, Section 270, U.S.C., 40 U.S. C.A. § 270, Grasser Contracting Company, as principal, and Continental Casualty Company, as surety, executed standard Government form of performance bond on November 21, 1932, by the terms of which said principal and surety became bound to the United States of America in the penal sum of $155,400 for the faithful performance of all the undertakings, covenants, terms, conditions and agreements of the aforesaid contract of November 17, 1932, entered into between the Grasser Contracting Company and the United States of America.

Under date of November 26, 1932, the Government notified the contractor to proceed with the work covered by the aforesaid contract and on November 29, 1932, receipt of this notice was acknowledged. The time fixed for completion of Items R–805–A, R–805–B, R–805–C, R–805–D and R–805–E, and Dicharry Levee, Relief Levee Item L–891 under this contract was within three hundred calendar days from the date of the receipt of notice to proceed with the work, thus fixing September 25, 1933, as the date for the completion of these items; the time fixed for the completion of the Upper Darrow Levee, Relief Levee Item L–894, was within ninety days from the date of receipt of notice to proceed with the work, thus fixing February 27, 1933, as the date for the completion of this item.

The contract and specifications provided that for each item of work liquidated damages for delay should be at the rate of $20 per day for each and every calendar day of delay beyond the time fixed for the completion.

The contractor completed all items under its contract except Relief Levee Items R–805–A and R–805–B of the Picayuneville-Waterloo Levee and Relief Levee Item L–891 of the Dicharry Levee.

The contractor did not prosecute the contract work involved in Relief Levee Items R–805–A and R–805–B of the Picayuneville-Waterloo Levee and Relief Levee Item L–891 of the Dicharry Levee in a diligent and satisfactory manner though the contracting officer gave repeated suggestions and instructions to the contractor in an effort to facilitate the completion of the work within the time stipulated in the contract. The correspondence on file shows that the defendant was conversant with the progress of the work, that as early as August 17, 1933, it anticipated that it would suffer a loss under the present bond but at no time did it protest or suggest to the contracting officer that its rights were in any manner being jeopardized.

On March 16, 1934, the contractor filed a petition in bankruptcy in the Eastern District of Louisiana, New Orleans Division, to be adjudged a voluntary bankrupt, and under the terms and conditions of the contract this operated as a default by the contractor.

On March 17, 1934, the contracting officer officially placed the contractor in default and terminated its right to proceed with the work under the provisions of Article 9 of the contract. On the same day the contracting officer advised the defendant of the action taken, requesting that it state whether or not it, as surety, desired to complete the work in accordance with the terms of the contract. In response to this inquiry the defendant in a telegram dated March 22, 1934 replied, " * * * this company as surety desires to complete the work in accordance with the terms of the contract and will proceed at the earliest possible time provided all necessary legal steps have been taken by the Government to cancel and annul the Grasser Contract * * *". In a letter of even date confirming this telegram it was stated, "Anticipating that all proper legal steps have or will be taken by the Government,

we are proceeding to perfect our plans for the completion of the work so as to do it as expeditiously as possible." On March 26, 1934, the contracting officer acknowledged receipt of these communications and enclosed a letter copy of his notice to the contractor dated March 17, 1934, stating that since on the aforementioned date the contractor was officially placed in default and its right to proceed with the work remaining to be done under the contract was terminated, his office was of the opinion that this constituted the only action necessary in the premises. On March 28, 1934, the defendant wrote the contracting officer and in commenting on the letter of March 17th said, "From the information we have here this letter would seem to be a sufficient termination of the contract." However, the defendant pointed out that this letter was served on the contractor after a voluntary petition had been filed in bankruptcy and suggested that it might be necessary for their mutual protection that this notice should also be served upon the receiver or trustee in bankruptcy or if neither had been appointed, then upon the bankruptcy court. After alluding to the fact that they were sending a copy of this letter to Mr. Milner, their local attorney, the letter states " * * * as we view it, it is very essential for the protection of the Government as well as this company, that the contract be properly annulled". The record in this case does not disclose whether or not the defendant ever received any advice from Mr. Milner to the effect that the contract either had or had not been properly annulled though Mr. Milner did testify that the contract was not cancelled and that he recognized the vast distinction in law between a termination of the contract and a termination of the right to proceed under the contract.

During the period of this correspondence P. E. Conner, an engineer representing the defendant, was in New Orleans seeking information for his company. On March 19, 1934, Conner addressed a letter to the contracting officer requesting a statement as of March 17, 1934, showing the number of cubic yards of embankment remaining to be completed on the unfinished items, the status of the sodding and a statement of the liquidated damages that had been deducted from the estimates. On March 24, 1934, this information was furnished. On March 27, 1934, Conner requested by letter that the contracting officer furnish him with a copy of each estimate paid the contractor on each item under the contract and a statement of the embankment placed by the contractor on each item from the date of the last estimate to March 17, 1934. By letter of March 30, 1934, this additional information was furnished.

On March 27, 1934, the defendant's local attorney having before him a copy of his client's letter of March 22, wrote the contracting officer at length claiming that the defendant was subrogated to the rights of the Government and entitled to take over and use the equipment in the completion of the work, that the American Bank & Trust Company and the Receiver had threatened to move this equipment, that he proposed to apply to the Court at the proper time for injunctive relief and requested the assistance of the Government in preventing the Trustee or Receiver in Bankruptcy from removing from the situs the equipment necessary to the completion of the work.

The American Bank & Trust Company had a chattel mortgage on the equipment and the bank as well as the Trustee at all times maintained that they were entitled to rentals for the equipment. On Friday, March 23, 1934, defendant's local counsel addressed a communication to the bank's attorney suggesting that in order to avoid a controversy he was willing to recommend, subject to the approval of his client, that the bank should receive certain specified payments in lieu of rentals. The letter in its concluding paragraph stated that he was sending a copy of this letter to his client by special delivery or air mail, that on Monday he was expecting a wire from them because on that day the inventory of what was at the situs would have been made, "and we will have decided at that time whether the Bonding Company will complete the contract or not." On March 26, 1934, this suggestion of compromise was withdrawn under instructions from the defendant's general counsel and the bank was at the same time advised that the machines on which it had a chattel mortgage must remain on the job without any rental charges until completion of the work otherwise claim would be made against it for the damages it would suffer. In a reply letter dated March 30, 1934, the attorney for the bank advised that his client proposed to take possession of

the machines as soon as it could secure title thereto, at which time they would consider a rental offer if the defendant desired to use the machines.

Negotiations having progressed to the extent outlined, defendant's local attorney in a letter of April 3, 1934, informed the contracting officer that he desired to make an immediate report to his client and requested that he be advised at once whether it would be his policy to pay the defendant on the usual estimates and progress payments as the work went along. Under letter of even date the contracting officer, citing an inaccurate syllabus from a decision of the Comptroller General, advised that no payments could be made to the surety during the progress of the work. In a reply letter of April 6, 1934, it was stated that when the surety acknowledged the default of its principal and accepted its responsibility to complete the work according to the terms of the contract, it had the right to believe that it would receive partial estimates and payments as the work progressed, that the contracting officer was now proposing an entirely new and different contract from the one bonded and that the defendant would not complete the contract under these new terms and conditions. On April 28, 1934, the defendant was informed that the chief of engineers had advised that a supplementary agreement might be entered into providing payment to them as provided in the contract and that such an agreement was being forwarded. On May 2, 1934, the defendant declined to go on with the contract claiming that it had been prejudiced by the delay, but no prejudice has been shown. Eight days thereafter the form of supplemental agreement referred to in telegram was referred to the defendant for its consideration and it declined to sign same stating again that it would not complete the contract.

On July 24, 1934, the defendant was notified that bids would be opened on August 8, 1934, for the completion of the remaining unfinished work on Items R–805–A and R–805–B, Picayuneville-Waterloo Levee and on Item L–891, Dicharry Levee, and that the original contractor and the surety would be held liable for any excess costs occasioned the Government thereby.

The work remaining to be done for completion of these three Items containing approximately 665,000 cubic yards, 135,000 cubic yards and 96,000 cubic yards, respectively, was readvertised for a period of fifteen days under specifications identical with the original specifications, bids were opened on August 8, 1934 and Cralan, Inc., was awarded the contract at 10.89 cents per cubic yard place measurement, which figure exceeded by 2.89 cents the unit price under the original contract.

On September 11, 1934, Cralan, Inc., commenced work on Item R–805–A and completed same on October 22, 1935; Item R–805–B was commenced on August 25, 1934, and completed October 5, 1934; Item L–891 was commenced on August 21, 1934, and completed on October 22, 1934.

Under the terms of Article 9 of the contract and paragraph 3 of the specifications liquidated damages at the rate of $20 per day on each item are chargeable against the original contract from the day following the nominal date of completion to and including the date of default or termination of the contract.

The uncontroverted evidence adduced at the trial shows that the cost of readvertising and reletting the work and the excess cost for job overhead, area, division and district overhead in the amounts claimed by the Government constitute an item of damage actually sustained by the Government.

The excess cost and liquidated damages due the United States by the defendant on its bond after crediting the original contractor with the amounts due which had not been paid at the time of default amount to $26,774.70, as set forth in the computation in article 27 of the petition.

The contractor was adjudged a voluntary bankrupt on March 16, 1934, and subsequent to the adjudication the Referee in Bankruptcy ruled that the plaintiff herein was entitled to be recognized as a creditor of the estate in the sum of $26,774.70. However, the estate was insufficient in amount to pay other than the costs and expenses of administration so the Government received nothing from the bankruptcy proceeding.

The defendant's plea in bar and special defense is predicated on the fact that the Government at one time refused to permit it to complete the work and receive partial payments therefor as the work progressed. The theory of the defense is that this action on the part of the contracting officer constituted a breach of the contract it

had made with the Government to complete the work and thereby released the defendant from all and every obligation or liability to the United States. The defendant, however, has offered no evidence to show that it could have completed the contract at an amount cheaper than the bid submitted by Cralan, Inc., nor has it shown that it suffered any more by the completion of the work by Cralan, Inc., than if it had completed the work itself.

■ On default of the Grasser Contracting Company the rights of the United States and the liability of the Continental Casualty Company became fixed. United States v. U. S. Fidelity & Guaranty Co., 236 U.S. 512, 35 S.Ct. 298, 59 L.Ed. 696; Board of Education v. Maryland Casualty Co., 3 Cir., 27 F.2d 20.

■ The action of the contracting officer in terminating the right of the Grasser Contracting Company to proceed with the work was not a cancellation or annulment of the contract.

If under this contract the right of the contractor to proceed with the work had alone been terminated, no new contract would have been required to enable the defendant to take over and complete the work in the name of its principal. If on the contrary the contract had been cancelled and annulled, a new contract between the defendant and the United States would have been required to enable defendant to take over and complete the work. See Section 774–b, War Department Regulations and Orders.

The evidence in this case shows the absence of any mutual understanding or agreement between the parties in that the defendant's expressed desire to complete the work in accordance with the terms of the contract was conditioned upon the cancellation and annulment of the Grasser contract; whereas the contracting officer did not contemplate a cancellation and annulment of the Grasser contract, but rather the termination of the contractor's right to proceed with the work and the completion thereof by the surety in the name of the contractor.

■ But assuming, as defendant contends, that the correspondence on file reflects a definite agreement and understanding that the surety was to complete the work in accordance with the terms of the Grasser contract, it does not follow that the contracting officer's letter of April 3, 1934, stating that under a cited decision of the Comptroller General governing disbursements of his office no payments could be made to the surety during the progress of the work, constitutes a breach of that contract for the contracting officer had no authority in law to refuse to make progress payments if that is what he did and he was not supported by the decision of the Comptroller on which he relied. 4 Comptroller Generals Decisions 611. It is settled that public officers are but agents whose authority is defined and limited by the law and therefore known to all persons dealing with them. Their acts beyond their lawful powers are ineffectual to bind the public which they represent. Hale County, Texas v. American Indemnity Co., 5 Cir., 63 F.2d 275.

■ Even if it be assumed that there was a contract and a breach thereof by the Government no damage has been shown.

This Court has no jurisdiction to entertain nor is there any merit in defendant's reconventional demand.

Plaintiff, the United States of America, is entitled to judgment in its favor and against the defendant, Continental Casualty Company in the amount of $26,774.70, together with legal interest at the rate of 5% per annum from October 22, 1935, until paid, and for all costs of this suit, and the Clerk is directed to enter judgment accordingly.